AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF _____

UNITED STATES OF AMERICA

V.

JONAH ADELMAN and
ENRICO BOTTA

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 2004-M-0499-RBC
-01
-02

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __October 14, 2004__ in __Suffolk__ county, in the _____ District of __Massachusetts__ defendant(s) did, (Track Statutory Language of Offense)

possess with intent to distribute oxycodone, a schedule II controlled substance, and conspiracy to distribute oxycodone, a schedule II controlled substance,

in violation of Title __21__ United States Code, Section(s) __841(a)(1) and 846__.

I further state that I am a(n) __Special Agent__ and that this complaint is based on the following
                                 Official Title
facts:

See Affidavit of Special Agent Christian Brackett, attached hereto, and incorporated by reference.

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

10-14-2004  at 4:27 pm   at   Boston, MA
Date                                City and State

Robert B. Collings
United States Magistrate Judge                    _____
Name & Title of Judicial Officer                   Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | M.J. Case No. _____ |
| v. ) | |
| ) | 2004-m-0499RBC-01 |
| Jonah Adelman ) | -02 |
| Enrico Botta, ) | |
| Defendant ) | |

### AFFIDAVIT OF SPECIAL AGENT

I, Christian Brackett, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Drug Enforcement Administration ("DEA"). I have been employed by the DEA since July 1997 and am currently assigned to the DEA's Boston Enforcement Group I. I have attended numerous drug-trafficking related training programs, and have had experience in investigating drug traffickers. I have participated in investigations involving cocaine, cocaine base, heroin, marijuana, oxycontin, ecstasy and other controlled substances.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information provided to me by other federal and local law enforcement officers and a previously reliable confidential informant ("CI").

4. This affidavit is submitted in support of a criminal complaint charging ENRICO BOTTA and JONAH ADELMAN with possession of oxycodone with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and conspiracy to distribute oxycodone in violation of 21 U.S.C. § 846.

5. In July of 2004, the CI met "Rico," later identified as ENRICO BOTTA, at a tanning salon in Framingham, MA, called Solar System (686 Worcester Road). BOTTA told the CI that he could obtain large quantities of OxyContin, 80 milligram, tablets (OC-80s). On August 9, 2004, the CI obtained, without DEA knowledge or approval, twenty OC-80s from BOTTA with the understanding that the CI would pay BOTTA $1,300.00 for the pills on August 16, 2004. The CI subsequently informed DEA agents about this arrangement. On August 17, 2004, based on instructions from DEA agents, the CI contacted BOTTA and told him that payment was not possible until the following week. This call was recorded by DEA. On August 20, 2004, an agent of the DEA, acting in an undercover capacity (the "UCA"), placed a recorded telephone call to BOTTA and asked BOTTA if he would accept payment from the UCA on behalf of the CI. Botta agreed, and the UCA met with BOTTA on August 23, 2004 and made the payment.

6. On September 26, 2004, BOTTA agreed in a recorded telephone conversation with the UCA to sell 50 OC-80s for $50 per pill. The UCA telephoned BOTTA the next morning, asserting that he had the payment, and BOTTA asserted that he had spoken with his source of supply (SOS) and would have the pills. In a series of recorded calls that morning, the UCA and BOTTA agreed to meet at Abe & Louie's restaurant on Boylston Street. BOTTA asserted that he would get the pills from the SOS, who worked near Faneuil Hall.

After further recorded cell phone discussions regarding the time and location of the meeting, the UCA and BOTTA met at the Salty Dog in Faneuil Hall, where BOTTA provided the pills in an Altoids container, and the UCA provided the funds in a FedEx envelope. At that meeting, BOTTA and the UCA discussed future purchases of 500 to 1000 pills.

7.   The UCA and BOTTA scheduled, via telephone, a purchase of 500 OC-80s for delivery on October 7, 2004. BOTTA then called the UCA to report that the SOS was unable to obtain 500 pills, but would be able to acquire 400 pills for $17,600. On October 6, 2004, the UCA received a call from BOTTA asserting that the SOS had missed a phone call to arrange a pick up, and that the delivery would be delayed till next week.

8.   The UCA and BOTTA have discussed details regarding BOTTA's SOS. BOTTA has stated that the SOS works for Venturi Career Partners, a headhunting firm at 1 Liberty Square, that the SOS grew up with BOTTA, that the SOS's girlfriend lives in New Hampshire, and that the SOS went to Union College. BOTTA has told the UCA that the SOS obtains his supply from the New York area from a person who went to college with the SOS at Union College.

9.   Comparison of the employee list of Venturi Career Partners with Union College alumni lists showed that JONAH ADELMAN of Natick, MA, is an alumnus of Union College and is a current employee at Venturi Career Partners. A Natick police detective reports that ADELMAN is believed to be a significant OxyContin trafficker. Natick police state that a known drug user reported seeing ADELMAN with $20,000 in cash and that ADELMAN had hired the drug user to pick up OxyContin pills from some individuals at the Rockingham Park in Salem, NH. Natick police also report that ADELMAN has a girlfriend who owns a condo in Nashua, NH.

10. After numerous additional recorded telephone calls, the UCA and BOTTA agreed on October 7, 2004 that the UCA would purchase 500 pills from BOTTA on October 12, 2004. On October 11, the UCA called BOTTA, and BOTTA asked to move the purchase to the same evening, October 11, 2004. The UCA declined and instead asked BOTTA to move the purchase to Wednesday, October 13, 2004. On October 12, 2004, BOTTA called the UCA to discuss the deal. BOTTA again expressed interest in doing the deal in the evening, while the UCA insisted on a daytime transaction. The UCA asked BOTTA to call his SOS and confirm that Wednesday October 13, 2004 would work for the purchase. BOTTA agreed, and agreed to talk with the UCA later in the day.

11. Later on October 12, 2004, the UCA called BOTTA on BOTTA's prepaid T-Mobile cellphone but the UCA's call waiting beeped in before anyone answered. The UCA took the new call, which was from BOTTA's prepaid T-Mobile phone. BOTTA stated that he was ready to sell 400 pills on October 13 at noon. The UCA questioned why the quantity had dropped, and BOTTA explained that he had just spoken with his SOS and that the source of the SOS was going away and other things. The pen register on BOTTA's phone showed at least two calls that day to the telephone for Venturi Career Partners.

12. In the evening of October 12, BOTTA called the UCA and advised that the purchase would need to be delayed until evening of October 13 because the SOS was going out of town in the morning. The UCA asked BOTTA to instead get the pills from the SOS in advance, so the deal could still take place during the day, but BOTTA refused. The UCA asserted that his funds were only accessible during the day. BOTTA called the UCA a short time later, and asserted that he had just spoken with his SOS, and that the SOS had just left for his trip to CT (Connecticut) in order to get back in time to make the sale on the evening of

4

October 13. The UCA again objected to a nighttime sale. Further conversations led to an agreement that the deal would take place between 9:00 am and 10:00 am on October 14.

13. On October 13, the UCA had phone contact with BOTTA, who reported that he was ready (to do the deal). The UCA and BOTTA agreed to meet the next day in Faneuil Hall Marketplace at approximately 9:00 am to consummate the deal.

14. During the morning of October 14, 2004, BOTTA and the UCA had additional phone contacts during which BOTTA told the UCA that he was with the guy (SOS) and that they would be in Boston at about 9am to meet the UCA.

15. At about 9:10 am, surveillance personnel observed BOTTA and ADELMAN in a black Chevrolet Trailblazer, previously known to be used by BOTTA, on Congress Street with two occupants. Surveillance personnel tracked the vehicle through the financial district, but lost sight of the vehicle for a short time. Surveillance personnel sighted ADELMAN driving the vehicle in the Faneuil Hall area, without a passenger. At about this time, the UCA had telephone contact with BOTTA, indicating readiness to meet at the Starbucks at the entrance to the Faneuil Hall Marketplace.

16. BOTTA and the UCA met at the Starbucks. While they were talking, other law enforcement personnel continued surveillance on ADELMAN. Over the course of the next few minutes, ADELMAN repositioned the vehicle a few times. The UCA asked BOTTA if he was "all set" and BOTTA stated that he was, but indicated that his SOS was somewhat edgy about the deal. At this time the UCA and BOTTA walked out toward the entrance to the Bostonian Millennium Hotel, where the UCA observed the Trailblazer parked near the entrance.

17.     As the UCA approached the vehicle, the UCA observed ADELMAN in the driver's seat, and BOTTA opened both the front and rear passenger doors, indicating that the UCA should get in. The UCA refused to get in the car, saying in substance that he doesn't do things (deals) that way. The UCA introduced himself to the driver, saying "I'm Ant" and the driver responded "I'm Jonah".

18.     After the UCA refused to get in the vehicle, the UCA walked away, with BOTTA following. BOTTA stated that he had not wanted to do the deal that way either, and the UCA and BOTTA talked about how to do the deal. The UCA offered to show BOTTA the money, and BOTTA used his NEXTEL cell phone to contact his SOS. Over the next 5 to 10 minutes, the UCA observed BOTTA on his NEXTEL phone. BOTTA indicated that he was talking with the SOS, and that the SOS was now uncomfortable with the situation and wanted to walk away from the deal. At the time that the UCA walked away from the Trailblazer, surveillance vehicles observed ADELMAN drive the Trailblazer from the hotel toward Congress Street, where ADELMAN turned onto Union Street, a short distance away from the UCA and BOTTA.

19.     The UCA at this point gave the arrest signal. A few moments later, surveillance personnel placed BOTTA under arrest in front of the McDonald's restaurant on Union Street.

20.     At the same time, additional surveillance personnel moved to arrest ADELMAN, who was still parked on Union Street in the Trailblazer.

21.     Law enforcement vehicles with blue lights flashing approached the Trailblazer from the front, driving the wrong way on Union Street. As they approached, ADELMAN drove in reverse on Union Street away from the approaching blue lights and backed into a

6

taxicab. ADELMAN then attempted to drive forward, and another law enforcement vehicle then blocked his exit, and the vehicles collided.

22. Numerous law enforcement personnel repeatedly directed ADELMAN to get out of the stopped vehicle. When he did not comply, officers attempted to open the doors. Finding the doors locked, officers broke the window of the vehicle and pulled him out to arrest him. At that time, ADELMAN yelled "Why are you arresting me? I didn't sell anything!"

23. As ADELMAN was being secured in handcuffs, I approached the vehicle. I looked in the front seat and the back seat. In the back seat of the vehicle, on the floor behind the passenger seat, I saw the pills in four clear plastic bags.

## CONCLUSION

Based on the information set forth in this Affidavit, I believe that probable cause exists to show that ENRICO BOTTA and JONAH ADELMAN knowingly and intentionally possessed oxycodone with the intent to distribute, and conspired to distribute oxycodone.

CHRISTIAN BRACKETT
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 14 day of October, 2004.

HON. ROBERT B. COLLINGS
United States Magistrate Judge